The next case on today's docket is the case of People's State of Illinois v. Wayne Welton. And we have Mr. Matthew Radfeld for the appellant and Mr. Patrick Daly for the affiliate. Thank you. May I please support? My name is Matthew Radfeld. I represent the appellant, Wayne Welton, in this matter. There are three points of contention in Mr. Welton's brief in support of his argument that he did not receive a fair trial in this matter. In our first point, Mr. Welton is asking this court to remand this matter for a new trial on the basis that the trial court erred in denying Mr. Welton's motion in limine to preclude the introduction of evidence regarding bad acts allegedly committed by Welton and by allowing testimonial evidence covered by the prosecution's witness, Dr. Rachel Winters. Evidentiary rulings are to be reviewed using an abuse of discretion standard. Pertaining to the first part of this point is the introduction of bad act evidence. Prior to the commencement of trial, Welton filed a motion in limine to exclude specific evidence of him calling the alleged victim, Tristan Wyatt, bad names and telling her what had been termed throughout the trial as dirty jokes. Welton has always maintained that this evidence is merely propensity evidence that would be and certainly was offered for the purpose of establishing Welton's bad character or propensity to commit the crime charged. Specifically, the prosecution wanted to introduce evidence that Welton had called his granddaughter, Tristan, a bitch on several occasions. Also, there were a couple of jokes that Welton had allegedly told Tristan over a two-year period wherein one dealt with a homosexual and one dealt with a racist, military-style cadence that talked about the prettiness of a female Eskimo genitalia. At pretrial proceedings, the prosecutor stated that such evidence was relevant and that it allowed Tristan to describe why she was uncomfortable around defendant Welton at times. Also, they argued it was necessary to explain her full relationship with her grandfather. The prosecution also requested that the court provide a limiting instruction once this evidence had been prevented to the jury. Now, under an abuse of discretion standard of review, a court's ruling may be remanded if it is unreasonable. Here, after arguments by the parties, the trial court ruled that all this reported evidence was nothing more than bad guy evidence and would be excluded from the jury. The court gave a very detailed explanation as to why it was not going to be allowed in. However, the prosecution did not relent. They asked for a brief delay in the proceedings so that they could get more information to the court and so that the prosecutor could talk to her supervisor. Then the prosecutor came back and submitted an article that talked about essentially the grooming habits of a pedophile. In this very long article, there was only a sentence or two that was even remotely relevant to the issues at hand and stated something about dirty jokes and name-calling. However, it had no specific examples as to when this would rise to the level of grooming. Now, this is a vast difference than the example that the prosecution gave in their brief where they cited people being marauded and that the courts affirmed the allowance of evidence that the defendant in that case made two children take off their clothes and tickle each other's private parts to show the defendant's intent, preparation, and plan. That is a far cry from what we have here. But again, this article presented by the prosecution should not have had any bearing on the court's original order that this bad guy testimony was going to be admitted as this sort of evidence because the prosecution had nothing to offer or an expert to present that would inform the jury that these bigoted so-called dirty jokes and bad names was grooming or was part of the grooming process. Once the court said it was going to exclude it, then the prosecutor talked about having to delay the trial in order to seek an interlocutory appeal because they claimed that they could not proceed with their theory of the case without this evidence. It was these threats wherein the trial court reconsidered its earlier decision to exclude the evidence. The trial court went from this being inadmissible bad guy evidence to letting it in for limited purposes, which no matter how you phrase it, it still put it out there to the jury. The court said it would provide a limited instruction to the jury, which was very generic and did not specifically mention the jokes or bad name calling. These were not adequate precautions in light of the presidential bad guy evidence. Now, prior to the publishing of the Child Advocacy Center DVD to the jury, the trial court instructed that the statements made by the victim, not Welton, were being admitted solely for the purpose of proving defendant's intent, lack of mistake, attitude toward the alleged victim, and the state of mind of the alleged victim. The trial court further instructed the jury that it is up to you, the jury, to determine whether the defendant was involved in that conduct or made those statements. And if so, what weight should be given to that evidence on the issues of Mr. Walton's intent, lack of mistake, his attitude toward the alleged victim, as well as the state of mind of the alleged victim? Well, in order for evidence to be admitted, its probative value must outweigh its prejudicial effect, and the evidence tended to make the existence of a fact more probable than it would otherwise be. But it is still inadmissible to prove propensity or just simply bad guy evidence. The evidence must actually, not just in lip service, be used to show motive, intent, identity, absence of mistake, or modus operandi. It is still inadmissible if it becomes the focal point of the trial and must have some sort of threshold similarity to the crime charge, such as the previous example I gave regarding the kids taking each other's private parts. It is not reasonable that two jokes about homosexual in an eskimo that weren't really sexual are in any way similar to the offenses charged in this matter. But we must analyze the court's instructions to the jury. How do these so-called jokes in Walton calling Tristan a bitch have any bearing on his criminal intent to molester? There are no logical similarities between the two. Lack of mistake. It shouldn't be relied on whatsoever, as this was not even a discussed defense, and the court and the prosecution knew that ever since an opening statement was given by Defendant Walton at the beginning of the trial, wherein the clear defense was he didn't do it. Walton's attitude toward the victim is not a cognizable exception to the introduction of this evidence, and it actually bolsters the argument that this is simply bad guy evidence. But if the court is basing that notion on the article provided by the prosecution in pretrial proceedings in regard to the grooming habits of a pedophile, still no expert testimony was presented to the jury to explain what this means. Lastly, the trial court in its attempt at a curative instruction stated that the jury is to determine how these jokes and name-calling affected the state of mind of the alleged victim, which also is not only not an exception to the introduction of this type of evidence, but it is also irrelevant in this context. This disputed evidence supported Tristan's view that her and her grandfather didn't get along, but it was nothing sexual. The court wanted to avoid a mini-trial on these statements, and even though the court had told the prosecution not to highlight or overemphasize these acts to the jury, that is exactly what happened. So if the prosecution then talks about it in their opening, then it's discussed in detail with five different witnesses' testimony or video evidence, and then they discuss it again at closing argument. How is that not overemphasizing this bad guy evidence that the state claimed in pretrial arguments as grooming habits with absolutely zero expert witness support? What is particularly bothersome in this matter is in the prosecution's brief, it is referenced twice that this evidence presented all of these times was necessary in order to rebut the defendant's defense at trial that this was a consensual encounter. Two places in their brief stated this. I cannot emphasize enough that there was never any defense presented throughout the course of this trial that defendant was arguing that this was in any way a consensual sexual encounter. But if that is what they are basing their arguments, that this evidence should be allowed in under that guise, then without a doubt there needs to be a new trial. Because the introduction of this evidence was forced to ask Tristan questions in cross-about, talking about it in closing, and we had to deviate from a simply didn't do it defense to explain it away as a motive for Tristan to lie. This evidence totally altered the tone of the trial. The defense simply could not leave it alone once this box had been opened and focused on so heavily. This then caused, and I will say required, the defendant to have to take the stand and explain the context of the jokes and name-calling and then be subjected to cross-examination on those issues, which again, this particular bad guy evidence to be highlighted to the jury. It is no wonder that the prosecution was in a panic and threatened to do an interlocutory appeal when this evidence was originally excluded by the court. This bad guy propensity evidence being introduced in this repeated manner was not harmless. Credibility was of the utmost importance in this case. Character evidence such as this, wherein the defendant hasn't opened the door to it, destroys his credibility-slash-likability to the jury. A jury that defendant Welton couldn't necessarily go dire on in regard to if the near members are gay or if they have family members who are gay or would be offended by racist-type jokes. A jury that was out for two days of deliberations. They labored over this decision. It is not possible to think that Welton, being an old bigot, didn't cut into this likability factor on this basis, which goes hand-in-hand with propensity evidence and would be a tipping point on any scale against his favor. The trial court here should have stuck with its original order and not labored because of the threat of being appealed. Defendant Welton deserved a fair trial, and he did not get it in this regard. On this basis alone, this court must reverse and remand this matter back to the trial court for further proceedings. The next issue under this point is the introduction of evidence brought forth by Dr. Rachel Winters. She was essentially brought in to bolster, improperly bolster, Tristan's statements that the alleged sexual abuse occurred. There was simply no other reason. She had no knowledge of anything specific to the players of the case. She had never interviewed the witness. She had never examined any medical records. She hadn't even looked at the case file itself. Dr. Winters stated... Thank you. You'll have the opportunity to rebut. Mr. Daly. Good afternoon, Your Honor. May it please the Court. Good afternoon. Counsel. Patrick Daly for the State. I am here on behalf of Tess Schwartz, who originally briefed this case for our office. She's moved on to be a clerk for Justice Carmeier. Let's just get one thing right out of the gate. I don't know why this was argued as evidence in support of a consent defense. There's no consent defense. It's not even a valid defense to this type of charge. So the context of my argument, as it goes forward, goes strictly to its probative value with respect to proof of the defendant's actions and not to use in support of a defense that was not raised. I want to correct one thing that counsel mentions during his argument, and that is with respect to the manner or the appropriateness of bad acts evidence. It was stated principally in terms of, well, it's admissible only under these circumstances, motive, lack of mistake, modus operandi, et cetera, et cetera. Although these are the most common and most often cited reasons why a court can consider and allow the admission of other crimes evidence or bad acts evidence, that's not an exclusive list. The courts have repeatedly stated that the existence of any fact, which is probative of the charge, is admissible, provided that its sole purpose is not simply to paint the defendant as a bad person. Now, having said that,  I think ultimately the rationale that the court subscribes to was that this type of evidence fell along the lines of what we call grooming evidence. Certainly it doesn't constitute the kind of evidence we might typically see, often with grooming evidence, where there's a direct investigation of sexualization in the minor that has something to do directly with the defendant himself and actions that we see oftentimes in cases that start kind of small but move bigger into something that eventually culminates in an act of sexual assault. Nonetheless, everything has a beginning. In this case, what we're talking about here, and the testimony was that I believe that one of the things that jumped out was that the defendant had made repeated jokes, Eskimo slang term for vagina is mighty cold, and they had done this strictly only solely in the presence of the minors in this case, not just the victim here, but a sibling. The point that we made here, and I think one of the reasons why the literature, the statements relied upon below, that this becomes part of perhaps the broader picture of the grooming process, is what it does is it introduces a sexualization aspect to the relationship between the older person, particularly one who's an authority, such as the grandfather, and the minor siblings, such that the invasiveness, the primary invasiveness of the sexual conduct by the defendant becomes something that is now normalized in the relationship rather than something that becomes startling. Now, that said, of course, I understand that we walk thin lines here in determining what is or is not appropriate grooming evidence, but the fact that it's highly sexual in nature, the fact that it precedes an act of intercourse that involves the same anatomical region, the fact that it involves strictly being made to the minor victims and is being presented by a family member, a direct family member, in that particular region, is certainly enough, I think, to convince the court that its prerogative values in that context, particularly when guided with limited instructions, is appropriate. Now... And she was a lover, is that correct? That's correct, Your Honor, yes. And then there was a sibling, I think it was 12, and then a third sibling who testified was an adult and that was the one that the victim called after the assault took place. It also, I believe, is prerogative to the extent of establishing the absence of mistake. Certainly, you know, you have an instance where a defendant is accused of digitally assaulting a victim in this anatomical region that's referenced to the Eskimo commons. Again, establishes, if you will, a certain mindset of the defendant and his attitude and behavior around the minor that's consistent with the type of action that the defendant undertook. Based upon, obviously, the similarity in the anatomical references and the modus of the crime itself. Now, with respect to the name-calling, the prerogative value of name-calling, well, let's state one thing. What's interesting about the name-calling argument is it really kind of cuts both ways. This is a case that was based upon not consensus, I indicated and conceded at the outset. It was based upon an argument by the defendant that he didn't do it, all right? So we have a case where a victim is making an accusation, the defendant is denying it. The jury is going to search for a reason why would the victim make such accusations against the defendant. The name-calling, the verbal abusiveness, I think, in a way, actually doesn't hurt the defendant as much as it helps him because it provided the jury a means by which to explain the inexplicable. Why would someone make such a heinous accusation against the defendant? But nonetheless, within the context of prerogativeness, name-calling things that beat down psychologically the victim are prerogative of a mindset of an individual who, precisely for what I just stated, wants to beat down a person psychologically so they can become less resistant, that their self-esteem is diminished, that their sense of self-worth is such that they find themselves in a position, ultimately, and this is by virtue of design by the defendant, that they become vulnerable to the defendant's advances and vulnerable to the defendant's actions, which the victim may perceive as not having any ability to fight against because they have been put to the point where they feel that their worth is not such that they have the capacity to fight back.  But those are not exclusive instances of grooming. Grooming can take on many forms. And the court here, again, in this exercise of discretion, the court discretion is, you know, one of the lowest standards of review and the most deferential standards of review, had initially denied this evidence, then reconsidered it. So far from the court making an ad hoc decision, as the defendant apparently suggests, the court had given a careful consideration and made a decision, and in fact, yes, it does meet this particular type of evidence for the very broad standard that courts have discretion to allow for the admission of other bad past evidence. So we would ask this court, obviously, to adhere to that court's discretion and find that it did not meet the high threshold for abuse that is one that no reasonable court could possibly come to under the set of facts in which it was presented. Now, with respect to Dr. Mimms, I'll go ahead and jump into this because I know counsel won't rebuttal. In this case, the victim testified, and there was testimony to the effect that after the sexual assault reportedly took place, a phone call had been made. The victim had perceived in her underwear what she characterized as white spots. Now, the underwear was forensically tested and would determine the negative for the presence of semen. And so, of course, what you've got out there is the victim making statements which seem consistent with some biological residue which the forensic testing did not establish. So Dr. Mimms, obviously, is one of these witnesses that the state perceives as to counter an argument that the defendant is going to make that her observations are not corroborative of what her claim the defendant did. By pointing out, through expert testimony, and only an expert can make this determination, not any lay witness, that the type of assault that the defendant undertook has a potential with a girl who is reaching the cusp of puberty to have a sexual reaction in the victim such that she would speak fluids, which themselves would then result in something consistent and similar to what the victim had testified to. So although the evidence was not presented as essentially stating that's exactly what it was, it did provide an explanation strictly within the realm and purview of an expert to make that establishes that her testimony in the presence of or in the absence of semen was not an unusual or an impossible type of description. And furthermore, there was no medical examination done of the victim in this case. And, of course, the jury is going to sit there and say, well, why hasn't the state put on any expert testimony? Is there a claim of sexual assault? Wouldn't there be some evidence of residual physical findings in the vaginal area given the type of assault that the defendant was accused of undertaking? The expert stated no. Given the time that elapsed from the time of these assaults to the time of this reporting, that medical examination would not have likely been beneficial or revealing to the degree of establishing physically the digital penetration. So certainly one of those two things is highly probative and relevant evidence from the state's perspective. I know you're running out of time. Yes, ma'am. But I'm concerned about the ad that was taken out and the effect it may have had. Okay. If I had one minute to do it, hopefully that would be enough. There's certainly a shock value to that ad. There's no doubt about it.  The shock value is only part of the equation. The second part of the equation is did that shock value actually have an effect on the trial such that a fair and impartial jury could not be selected? Okay. If I can just finish this part. Thank you. So what we have in this situation with this court reviews, the court is certainly aware of the inflammatory nature of this article, which appeared once in the local paper, okay, but said, look, let's go ahead and do our bar here. Let's talk to these witnesses. Let's see what exposure they've had. Can we find a jury of impartial individuals who have not been aware of this article? And can we then proceed to trial? And that is the standard. Can we get a fair and impartial jury? Okay. Unlike the Taylor case where the pretrial publicity was so extensive that they couldn't even find a jury, they hadn't been tainted in some way. In this court, the court went to great pains to ensure that there was a jury of 12 plus 2 alternates, I believe, that had not been exposed to this article. And therefore, Your Honors, don't rule simply on the inflammatory nature of it. It's an emotional response. It's the broad spectrum of it. It's the inflammatory nature of it. But what did that affect defendants' right to a fair trial by getting a fair and impartial jury? And the answer to that is, clearly, it did not. There was a fair and impartial jury based upon the extensive article. Thank you. Thank you, Your Honor. Mr. Radcliffe. Again, thank you, Mr. Court. Again, you heard the prosecution just talk about in a couple different manners in which expert testimony. Okay. He talked about a sexualization aspect. He talked about accruing evidence. All of that is evidence that should have been put in front of the jury by an expert used to explain that. You can't throw this stuff out there as was argued by the prosecution in pretrial and said, hey, okay, we have this article, which was the only difference between how the court originally ruled versus how they later ruled admitting this evidence, was the introduction of this article that talked about accruing evidence. But yet the prosecution throughout the entire course of the trial never presented an expert to talk about that. Now, they brought forth an expert, Dr. Rachel Winters, to talk about how it's normal for females when they are sexually stimulated to have a secretion. They also had Dr. Winters talk about the fact that even though she hadn't examined this particular girl, that after this time frame when it was finally reported to the police, that she was improperly bolstering Tristan's comment as to why she didn't want to go get tested. Okay. But again, no specific expert testimony given to why this bad guy evidence was supposed to be put into trial. Now, he talked about absence of mistake. Again, that was never a defense that was put forth from the very, very beginning of the trial. So if that's one of the reasons as to why that evidence was allowed in, they knew from the very beginning that was faulty and the court never should have allowed it in over our objection. Now, the fact – the name-calling, that is our job as the defense attorneys to put forth a defense, not have it be force-fed upon us upon the introduction of this irrelevant and inflammatory bad name-calling that would shed – definitely shed Mr. Welton in a negative light. So – and also in regard to the ad that was put forward, it was three months before the trial was supposed to take place in the very county, not a very large county, not with a lot of cabinets. And it was a full-page ad that had the booking photo of Mr. Welton with enormous words that said sexual predator. And throughout Hoar Dyer, majority of the individuals heard it in there. But because of the fact that we had to highlight it to the jury, even to the members who sat, that they had to sit there and they had to hear about it. They had to see. They had to – Weren't they individually Hoar Dyer? They were individually Hoar Dyer. Regarding that. And it was a very – pointed out to them. I mean, the fact that his picture was in there, the fact that sexual predator was on there, the fact that the father of the victim was inviting people to come to this restaurant and enjoy a free meal so he could tell them about all the negative stuff of Mr. Welton. So even if they didn't see the ad, throughout the course of Hoar Dyer they heard about it. And again, that would cut into the realistic aspect that Mr. Welton was going to get a fair jury in this case. Thank you. Thank you. Thank you both for your arguments and briefs. And we'll run to a decision.